Filed 2/24/21  Razuki v. Malan CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| SALAM RAZUKI, | D075028 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. 37-2018-000034229-CU-BC-CTL) |
| NINUS MALAN et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of San Diego County, Eddie C. Sturgeon, Judge.  Affirmed.

G10 Galuppo Law, Daniel T. Watts and Louis A. Galuppo; Noonan Lance Boyer & Banach, James R. Lance and Genevieve M. Ruch for Defendants and Appellants Ninus Malan, San Diego United Holdings Group, LLC, Flip Management, LLC, Balboa Ave Cooperative, California Cannabis Group, and Devilish Delights, Inc.

Goria, Weber & Jarvis and Charles F. Goria for Defendants and Appellants Chris Hakim, Mira Este Properties, LLC, and Roselle Properties, LLC.

Law Offices of Steven A. Elia, Steven A. Elia, Maura Griffin and James Joseph; Williams Iagmin and Jon R. Williams for Plaintiff and Respondent.

Defendants Ninus Malan and Chris Hakim (and related entities) appeal from an order imposing a receivership over two cannabis businesses: a retail dispensary and a production facility. The trial court imposed the receivership after Salam Razuki sued the defendants, alleging he had interests in the businesses and defendants were diverting money owed to him. The manager of the cannabis businesses, SoCal Building Ventures, LLC (SoCal), intervened in the lawsuit and also requested the receivership. The court imposed the receivership pending the resolution of the many disputes among the parties in the litigation.

Defendants assert numerous challenges to the court's receivership order. We determine the court acted within its broad discretion and its legal rulings were supported by applicable law. We thus affirm.

## OVERVIEW

The proceedings leading to the receivership followed a chaotic and procedurally confusing path before three different trial court judges, and involved thousands of pages of conflicting documentation about the parties' activities and their investments in the real property where these all-cash businesses operated. The allegations included accusations that money and equipment had been stolen from the businesses and claims that Malan's counsel and the receiver had committed malfeasance.

Razuki and Malan's business relationship began with commercial real estate investments in 2009, and eventually expanded into several cannabis businesses. By 2017, however, the relationship was strained, and they entered into a settlement agreement to clarify their ownership of and rights to the expected profits from three cannabis businesses: (1) A retail

2

dispensary located on Balboa Avenue (Dispensary); (2) a production facility located on Mira Este Court (Production Facility); and (3) a planned cannabis cultivation facility to be located on Roselle Street (Planned Facility). Malan owned the entity that held title to the Dispensary property, and Malan and Hakim both owned shares in the entities that held title to the Production and Planned Facilities properties. Razuki claimed interests in these businesses through his relationship with Malan.

After the settlement agreement, Malan and Hakim contracted with SoCal to manage the Dispensary and the Production Facility. This contract provided SoCal with options to purchase interests in the businesses. In May 2018, Razuki learned from SoCal that Malan had allegedly failed to disclose profits to him, and SoCal learned that Razuki claimed an interest in the Dispensary and Production Facility properties and/or businesses. After SoCal questioned Malan and Hakim's rights to option the properties, they unilaterally terminated SoCal's management agreements and locked SoCal out of both facilities.

Two months later, Razuki filed the complaint against Malan, Hakim, and numerous entities formed to operate the three cannabis businesses (detailed below). Within days, Razuki brought an ex parte application requesting the appointment of a receiver over the three businesses and SoCal filed an ex parte request to file a complaint in intervention against the same defendants. SoCal also joined Razuki's request for a receiver. These filings opened two months of intense litigation concerning the appointment of a receiver, generated thousands of pages of briefing, declarations, and exhibits, and resulted in five hearings before three different judges: Judge Kenneth Medel (who initially appointed the receiver and was peremptorily challenged); Judge Richard Strauss (who vacated the receiver and was

3

peremptorily challenged); and Judge Eddie Sturgeon (who appointed the receiver in the challenged order).

After the matter was assigned to Judge Sturgeon, the parties filed voluminous documentation describing wildly different versions of events and competing theories of ownership of the businesses. Judge Sturgeon reinstated the receiver temporarily over the Dispensary and Production Facility, but not the Planned Facility, and set another hearing to confirm the appointment. By the time of that hearing, the court had before it evidence showing Razuki's significant investment into the businesses at issue; multiple competing claims on the ownership of the assets; at least one separate pending lawsuit to quiet title over the Dispensary; and allegations that Malan and his counsel had directed Dispensary employees to abscond with thousands of dollars in cash after Judge Medel's initial order appointing the receiver. After an extensive hearing, on September 26, 2018, Judge Sturgeon ordered the receiver to remain in place for an additional 60 days. Malan and Hakim (and related entities) now appeal from this order.[1]

Malan contends (1) technical errors in the procedure for the appointment of the receiver require reversal; and (2) his 2017 settlement agreement with Razuki is unenforceable as against public policy because its subject matter, the sale of cannabis, was unlawful when the agreement was

---

[1]    On November 16, 2018, after the notices of appeal were filed and before any briefing, federal officers arrested Razuki for plotting to hire a hitman to kidnap and murder Malan in Mexico to put an end to this litigation. At the time of the briefing, Razuki awaited trial on federal charges of conspiracy to murder and kidnap Malan. As explained below, these facts occurred after the challenged September 26 receivership order and thus are not before us in deciding the propriety of this order. But these facts would be relevant to any further court orders in this case.

4

made.  Malan and Hakim both assert (1) the unclean hands doctrine precludes the equitable receivership remedy; (2) Razuki lacked standing under the receivership statute to pursue his claims; and (3) appointment of the receiver must be reversed because Razuki failed to show a probable right of possession of the assets, that the balance of harms supported the appointment of a receiver, or that a less drastic remedy was not available.  Hakim's arguments concern only the appointment of the receiver over the Production Facility because he claims no ownership interest in the Dispensary.

As we shall explain, the trial court's discretion to appoint a receiver at this preliminary stage of litigation is broad, and to "justify our interference, it must clearly appear that the appointment was an arbitrary exercise of power."  (*Maggiora v. Palo Alto Inn, Inc.* (1967) 249 Cal.App.2d 706, 711 (*Maggiora*).)  Applying this standard, we reject appellants' arguments that the trial court abused its discretion.  We also determine appellants' other contentions lack merit and affirm the receiver appointment.

## FACTUAL AND PROCEDURAL BACKGROUND

The contours of the relationship between Malan and Razuki are not clearly spelled out in the record before this court.  Their declarations show the business relationship began around 2009 and that Razuki initially hired Malan to manage his struggling Chula Vista commercial shopping center, followed shortly after by another commercial property.  Malan excelled in this role, and Razuki brought him into his real estate investment business, partnering with Malan on the purchase, sale, and rental of commercial properties.

Eventually, the two became partners in the cannabis businesses which ultimately led to this litigation among Razuki, Malan, Hakim, and the

5

various entities. The proceedings leading to the receiver appointment were lengthy and factually disputed. To properly evaluate the appellate contentions, we describe in some detail the facts and procedure leading to the appointment.

## A. Allegations in Razuki's First Amended Complaint

On July 13, 2018, three days after filing his initial complaint, Razuki filed an amended complaint against Malan and Hakim and the various entities owned or controlled by them. These entities fall into three categories: (1) the entities holding title to the property where each of the three marijuana businesses was located[2]; (2) entities created to hold title to the required state licenses for each business[3]; and (3) the entities created to serve as the operating entity for all the cannabis operations (Flip Management, LLC (Flip) and Monarch Management Consulting (Monarch). These three category of entities will be collectively referred to as the Related Entities. The first category entities will be referred as the Property Owner entities.

---

[2] These entities are (1) San Diego United Holding Group, LLC (SD United), property owner of the Dispensary location; (2) Mira Este Properties, LLC (Mira Este), property owner of the Production Facility location; and (3) Roselle Property, property owner of the Planned Facility location. Malan was the sole owner of SD United, and Malan and Hakim held equal interests in the other two property-owning entities.

[3] These entities are Balboa Ave Cooperative (Balboa Co-Op) for the Dispensary; California Cannabis Group (CCG) for the Production Facility; and Devilish Delights, Inc. (Devilish) for the Planned Facility. The licenses were required under state laws that closely regulate cannabis businesses. (See Bus. & Prof. Code, § 26000 et seq.) Cities and counties also regulate these businesses through their land use and police powers, including through conditional use permits (CUP). (See *id.*, § 26200, subd. (a)(1).)

6

In the amended complaint, Razuki alleged that when he and Malan decided to enter the cannabis industry as partners, they had an oral agreement that "Razuki would provide the initial cash investment to purchase a certain asset while Malan would manage the assets. The parties agreed that after reimbursing the initial investment to Razuki, he would be entitled to seventy-five percent (75%) of the profits & losses of that particular asset and Malan would be entitled to twenty-five percent (25%) of said profits & losses."

According to the complaint, the oral agreement between Razuki and Malan faltered in early 2017, when the entity that held property ownership of the Production Facility (Mira Este) required additional capital for renovations. Malan was able to secure a $1.08 million loan based in part on Razuki's personal guarantee and real property collateral. According to Razuki, however, the proceeds of the loan were not used on improvements to this property, but were instead taken by Malan and Hakim for their personal use.

On November 9, 2017, Razuki and Malan entered into a written agreement to settle their interests titled "Agreement of Compromise, Settlement, and Mutual Release" (Settlement Agreement). The Settlement Agreement required the transfer of the partnership assets to a new entity, RM Property Holdings, LLC (RM Property). The agreement describes the partnership assets as consisting of various portions of the three Property Owner entities and Flip, and Razuki's minority interests in two additional assets (Sunrise Property Investments, LLC (Sunrise) and Super 5 Consulting Group, LLC (Super 5)). The Agreement states Razuki and Malan "hereby reaffirm and acknowledge the terms of the Operating Agreement [for RM Property] provide for the repayment of the Partner's Cash Investment

7

prior to any distribution of profits and losses. The Parties further reaffirm that once the partner's cash contribution has been repaid by the Company, then Razuki shall receive [75%] of the profits and losses of the Company and Malan shall receive [25%], all as set forth under the terms of the Operating Agreement."

Under the Settlement Agreement, Razuki and Malan had 30 days to make their best efforts to transfer these assets to RM Property and to perform an accounting of their cash investments in those assets. Razuki alleges that Malan asked for additional time to perform the accounting and also contracted with SoCal to serve as the operator for the cannabis operations at the Dispensary, the Production Facility, and the Planned Facility.

The SoCal management agreements gave SoCal the right to retain all revenue from the businesses in exchange for a guaranteed monthly payment to Monarch (formed to serve as an operating entity for all cannabis operations). Razuki alleged that although the agreements required payment to Monarch, Malan did not disclose the existence of Monarch to Razuki. Instead Malan told Razuki that SoCal's monthly payments would be deposited into accounts of Flip (the other operating entity) or the Property Owner entities. Also allegedly unknown to Razuki, the management agreements gave SoCal an option to purchase a 50 percent interest in each of the Property Owner entities.

In January 2018, Malan notified Razuki that he was close to completing the sale of the three Property Owner entities to SoCal and that transferring the assets to RM Property, as required by the Settlement Agreement, would unnecessarily complicate the sale. From January to May 2018, Malan represented he was continuing to negotiate the sale of the

8

Property Owner entities to SoCal and that Razuki would receive 75 percent of Malan's share of the sale proceeds. During this time, Razuki asked for an accounting of the businesses and Malan told him none of the operations were profitable.

Then, in the second week of May 2018, Razuki met with SoCal's principal, Dean Bornstein. Bornstein told Razuki that SoCal had been making monthly payments to Monarch and that the Dispensary and the Production Facility were both profitable. As a result of this conversation, Razuki believed Malan was hiding profits and trying to eliminate Razuki from the businesses. After the meeting, SoCal also became suspicious of Malan and Hakim because SoCal was previously unaware of Razuki's claimed interest in the properties. As a result, SoCal sent a letter to Malan requesting confirmation of his ownership of the three Property Owner entities, and also indicating that SoCal wished to exercise its purchase options.

On July 9, Malan allegedly withdrew $24,028.93 from RM Property's bank account that had been deposited by Razuki, changed the locks at the Dispensary, and changed passwords for the Dispensary's security systems. During the next two days, Malan and Hakim terminated SoCal's management agreements, renamed the Dispensary, and told employees there was new management.

Based on these factual allegations, Razuki asserted numerous causes of action against Malan, Hakim and the Related Entities. These claims included: breach of the Settlement Agreement, the oral agreement, and the good faith implied covenant against Malan; breach of fiduciary duty against Malan, Hakim, and Monarch; fraud against Malan; money had and received against Flip and the Property Owner entities; conversion against Malan,

9

Hakim, and Monarch; an accounting claim against Malan and Hakim; appointment of a receiver against all defendants; injunctive relief to prevent all defendants from selling, transferring, or conveying any asset or property; declaratory relief against Malan; constructive trust against Malan and Monarch; dissolution of RM Property; intentional interference with prospective economic advantage against Malan, Hakim, and the entities holding licenses; and intentional interference with a contractual relationship against Hakim and Monarch.

## B. Razuki's Application for Receiver Appointment and SoCal's Application to File Complaint In Intervention

Three days after the amended complaint was filed, on July 16, Razuki filed his ex parte application for the appointment of receiver and preliminary injunction. The application sought the appointment of Michael Essary as receiver to take possession of the assets of RM Property, and each of the Related Entities.

The same day, SoCal filed an ex parte application to file a complaint in intervention. The proposed complaint named the same defendants, repeated many of the same allegations, and also sought the appointment of a receiver over the Related Entities. SoCal alleged defendants had concealed the existence of Razuki's ownership interest in the three facilities, and defendants had violated the management agreements.

According to SoCal's complaint, after SoCal learned of Razuki's interest and questioned Malan and Hakim, Malan informed SoCal that defendants' ownership of the Dispensary was also disputed in a separate pending case in San Diego Superior Court. SoCal responded with a request that defendants sign a tolling agreement to suspend the option deadlines, but also expressed hope the relationship could be salvaged.

10

On July 10 (the day Razuki filed his initial complaint), defendants' counsel sent a letter to SoCal terminating the three management agreements, and asserting SoCal was in breach of the agreements for failing to make contractually required payments and failing to appropriately manage the facilities. By the next day, Malan and Hakim had locked SoCal out of both the Dispensary and the Production Facility, and had repainted the dispensary and changed its name and signage. SoCal's complaint alleged that defendants "destroyed the facilities' financial records, receipts, printers, barcode scanners, and point of sale tracking information . . . ."

## C. Hearing on Receiver Appointment and Intervention Complaint

The hearing on Razuki's ex parte application for receivership and on SoCal's ex parte application to file its intervention complaint occurred on July 17. During the brief hearing, Razuki's counsel outlined the basis for the requested relief, explaining that Razuki believed Malan and Hakim had hidden over $1 million in management fees received from SoCal. He also argued a receivership was needed because defendants had violated their management agreements with SoCal, locking SoCal out of both the dispensary and production facility and preventing SoCal from accessing its valuable manufacturing equipment. SoCal also joined in the application for a receiver.

Gina Austin specially appeared on behalf of all of the defendants and said she had not yet been retained in the matter, and that none of the defendants had yet been served with the application for receiver or the complaint in intervention. Austin indicated she had briefly reviewed the receiver application before the hearing, and argued there was no urgency identified that required immediate relief.

11

The court granted SoCal's application to intervene and then without explanation stated it was "going to grant the relief requested. The injunction is granted. Receivership is appointed." The same day, the court issued a minute order confirming its rulings and signed a proposed order submitted by Razuki, which appointed a receiver over RM Property and the Related Entities (encompassing all three businesses). The orders directed both Razuki and the receiver to post a $10,000 bond within five days. The orders also set an August 10 order to show cause (OSC) to confirm the receiver appointment. Razuki and the receiver, Essary, submitted proof of the requisite undertakings to the court that day.

## D. Malan's Peremptory Challenge and Motion to Vacate Receivership; Razuki's Ex Parte Application to Reset OSC Hearing

The day of the hearing, Malan filed a peremptory challenge. The OSC hearing was then vacated and, on July 25 the case was reassigned to Judge Strauss. Three days later, on July 28, Razuki filed an ex parte application for an order to reset the OSC hearing. Before the court took action on this application, Malan filed a competing ex parte application to vacate the receivership order. The application also sought a temporary restraining order (TRO) to prevent Razuki from "transferring money or disposing of property obtained from one of the Defendants since the receivership order was issued" or from entering any real property controlled by defendants.

Malan's moving papers presented a version of events completely at odds with those presented by Razuki and SoCal. Malan asserted that Razuki had no ownership interest in the businesses, pointing to grant deeds transferring the Dispensary and Planned Facility properties to the two Property Owner entities (SD United and Roselle). Malan's declaration stated that he and Razuki mutually agreed to rescind the Settlement Agreement in

12

March 2018 after Razuki was unable to transfer his interests in Sunrise and Super 5 to RM Property. Malan alleged that Razuki filed the lawsuit because "of a large judgment a litigant obtained against him in another lawsuit, which is causing Razuki some cash flow problems."[4]

With respect to SoCal, Malan asserted that in January 2018, the three entities holding the medical marijuana licenses (Balboa Co-op, CCG, and Devilish) hired SoCal to operate the three properties, but SoCal had mismanaged the properties. Malan claimed SoCal had poorly controlled inventory, failed to have sufficient security present and hired a security guard not authorized to carry a firearm, failed "to pay employees correctly," and failed to pay required insurance. Malan also asserted SoCal gave confidential information to Razuki and withheld payments related to the Production Facility property, causing the owner (Mira Este) to default on a loan. Malan said SoCal was conspiring with Razuki "to hijack the three businesses" by filing this lawsuit.[5]

Finally, Malan's declaration detailed dramatic events that unfolded on July 17, the day Essary was appointed. Malan stated that after the hearing, several SoCal employees, including one carrying a visible gun, accompanied Essary to the Dispensary parking lot. Malan said he called the police when he saw the "gunman" and when the police arrived at the premises, Essary

---

[4]    Malan also said the homeowners association rules governing the Dispensary property prohibit marijuana operations; the association had sued on this issue; and that the lawsuit had resulted in a February 2018 settlement granting a variance to the Property Owner entity (SD United) to operate the Dispensary if certain conditions were met.

[5]    Malan also noted the entity holding title to the Dispensary property (SD United) had filed a cross-complaint to quiet title to this property in a separate pending case against Razuki.

13

and the SoCal employees "fled." According to Malan, the employees and Essary returned later in the day, "broke down the door and invaded the building," and stole computers and other equipment. Malan stated that Essary's decision to rehire SoCal after his appointment was evidence of negligence and Essary's inability to manage the businesses.

A supporting declaration from Malan's counsel (Austin) corroborated Malan's statements about the receiver's takeover of the Dispensary. Austin also claimed Essary could not lawfully run the businesses because Essary was not properly licensed. Austin also said the Dispensary was under audit by the City of San Diego and both the Dispensary and Production Facility had upcoming hearings related to their conditional use permits that would be jeopardized by Essary's involvement.

SoCal filed an opposition, refuting Malan's allegations and asserting Malan had made material misrepresentations to the court. SoCal stated Malan falsely claimed Essary had threatened Dispensary employees, when in fact those employees had barricaded themselves into the store "so they could steal the dispensary's money in violation of the [receivership] order, and flee with bags of 'loot' into their attorney's 'getaway car.'" In support, SoCal submitted Essary's declaration stating that after the July 17 hearing, Austin told him she was advising her clients not to follow the court's order and to resist any attempt by Essary to take control of the assets. Essary also described the scene when he went to the Dispensary, explaining the employees locked themselves in a backroom with the safe and security cameras, loaded bags with money, and fled out the back door into Austin's waiting car.

## E. July 31, 2018 Hearing Before Judge Strauss

On July 31, Judge Strauss heard Razuki's ex parte application to re-set the OSC to confirm the appointment of the receiver and Malan's ex parte application to vacate the receivership. Counsel for Malan and the entities argued the receivership order was void because Razuki had failed to provide proper notice, the receiver had a prior relationship with Razuki and SoCal that disqualified him, Razuki had failed to show a sufficient ownership interest in the entities, and there was no urgency that supported the drastic remedy of a receiver.

Razuki's counsel responded that Razuki's submitted evidence showed that Malan was attempting to steal assets from Razuki and SoCal, which had invested $2.6 million in equipment and other improvements to the properties. SoCal's counsel asserted there was urgency because Malan had begun to sell SoCal's equipment, and Malan and Hakim had diverted millions of dollars to Monarch that was owed to Razuki. SoCal also asserted a receiver was necessary because the operators hired by the defendants after SoCal's termination threatened the viability of the businesses and the value of its purchase options.

Near the conclusion of the contentious hearing, Hakim's counsel proposed a compromise, suggesting the court issue an injunction returning the parties to the status quo that existed before the receivership order, and that prevented any transfer of funds outside the ordinary course of business. Counsel suggested Razuki could then bring his request for a receiver again, on a noticed motion on shortened time with full briefing and the opportunity to submit evidence. The court adopted the proposal and directed Hakim's counsel to prepare a final order. The court declined to set a date to hear a new motion, instead instructing the parties "when you're ready to file

15

whatever it is you're going to file, we'll see what kind of date we can give you. And we'll make it as soon as possible, but I don't know what that is exactly."

The court issued a minute order on July 31 stating the request to vacate the receivership was granted and directing "counsel to prepare a proposed order for the [c]ourt's review and approval." The order also granted Essary's request to employ counsel and "as to all other matters; the [c]ourt instructs counsel to proceed via noticed motion for remedies being sought."

## F. Peremptory Challenge and Case Reassignment to Judge Sturgeon

After the July 31 hearing, SoCal filed its peremptory challenge to Judge Strauss and the case was again reassigned, this time to Judge Sturgeon. On his own motion, Judge Sturgeon scheduled an August 14 hearing to revisit the appointment of the receiver.[6]

On August 10, Razuki filed a "supplemental memorandum of points and authorities in support of appointment of receiver and opposition to [Malan's] ex parte application to vacate receivership order." Razuki argued Judge Strauss's minute order was ineffectual because the court had not

---

[6] The status of Judge Strauss's order vacating the receivership was left in limbo. On August 7, 2018, Hakim's counsel submitted a proposed order to the court, as directed by Judge Strauss, with a letter to Judge Sturgeon explaining the circumstances. Razuki's counsel represented in a declaration filed on August 10, 2018, that Judge Sturgeon's clerk contacted her on August 8, 2018, by telephone and stated that because Judge Strauss had directed counsel to prepare an order after the hearing, and no order was ever signed, the July 31, 2018 minute order vacating the receivership "did not constitute a valid and final order and the receivership was never vacated." Essary submitted a report to the court on August 10, 2018, which stated it was his understanding that the order vacating his appointment was never made final, and that Judge Sturgeon had scheduled an ex parte hearing on August 14, 2018, "to 're-hear' Defendants' ex parte application to vacate the receivership."

16

signed any final order after the hearing, and he again argued the merits of appointing the receiver. Razuki's counsel outlined in more detail the payments made by SoCal to Monarch that he asserted were misappropriated by Malan and Hakim, and described the potential profitability of the businesses.

In support of his supplemental brief, Razuki filed voluminous records attached to his and other declarations, showing his specific investments into the Dispensary, Production Facility, and Planned Facility properties. For instance, Razuki attached evidence that he invested $254,780 for the down payment for the Production Facility property and paid $200,000 for the operation's business tax certificate, while Hakim invested $420,000 toward the down payment. Razuki also explained that he transferred the Dispensary property from Razuki Investments, LLC, his wholly owned entity, to the Property Owner entity (SD United) because he did not want to violate a settlement agreement he had previously reached with the City after another property he owned was charged with operating a dispensary unlawfully. That other settlement prohibited Razuki from owning a nonpermitted cannabis facility and Razuki feared the Dispensary's violation of the homeowners association rules precluding marijuana operations might constitute a violation.

Malan also filed supplemental briefing, a supporting declaration, and his counsel's declaration. Malan argued the Settlement Agreement was unenforceable because it was in violation of public policy and Razuki had not shown the medical marijuana businesses covered by the agreement were conducted in conformance with the law. Malan also argued that Essary had acted illegally by reinstating SoCal as the operations manager and failing to

17

secure appropriate approval from the state licensing authorities before assuming the receivership.

In his declaration, Malan said that on July 31 (the date of the prior order), he witnessed SoCal employees use a moving truck at the Production Facility to attempt to steal equipment and an office computer. Malan also claimed Essary had stolen $80,000 from the Dispensary. Hakim's declaration stated he paid more than one-half the down payment for the Production Facility property and that Razuki "was insistent on not wanting to appear of record on title in connection with [this] acquisition. . . ."

Neither Malan's nor Hakim's declarations disputed Razuki's assertions concerning his specific ownership interests in the various properties, including that he was the source of a large portion of the down payment for the Production Facility property and had paid for the $200,000 business tax certificate.

### G.  August 14, 2018 Hearing

On August 14, the parties appeared before Judge Sturgeon for the first time. At the start of the hearing the court rejected the idea that it was conducting a rehearing of the prior orders and stated it would hear the matter anew on August 20. The parties' counsel then disputed whether the receivership had been vacated at the July 31 hearing because no final order had been signed.

After asking questions about the parties' documentation, the court stated it was not reinstating the receiver, and instead would institute a new, temporary order. This order froze all related bank accounts until the next hearing (although it allowed certain product purchases) and enjoined the sale of the three properties at issue.

18

## H. Briefing for August 20, 2018 Hearing

On August 17, 2018, the parties filed additional briefs and voluminous documentation in support of their positions.

Malan filed a supplemental brief and a 20-page supplemental declaration describing additional facts about his relationship with Razuki and the financing and prior ownership of the properties owned by SD United (the Dispensary property owner). Malan also again alleged malfeasance by Essary, asserting payments of over $100,000 to "SoCal insiders" and thousands of dollars to himself while in control of the businesses' bank accounts.

Malan continued to refute Razuki's ownership claims, asserting for the first time that SD United purchased the Dispensary property from Razuki in March 2017, subject to a $475,000 loan held by Razuki that Malan paid off three months later. Malan stated that Razuki abandoned his interest in the Dispensary property because his ownership in another dispensary (Sunrise) was far more lucrative. Malan stated that SD United purchased five other units adjacent to the Dispensary for $1.6 million with financing that did not involve Razuki. Malan repeated his prior allegations that he was coerced into signing the Settlement Agreement, and that he and Razuki mutually agreed to cancel it around January or February 2018.

Hakim's supplemental papers pertained mainly to its claims about SoCal's alleged mismanagement and sought to rebut SoCal's assertions it had option rights and rights to its equipment at the facilities. Hakim also noted that the Planned Facility was currently occupied by a tenant whose rent payments could easily be accounted for.

Razuki also submitted a supplemental brief in which he claimed Malan had immediately violated the court's order by contacting the bank for one of

19

the entities, and another declaration with additional documentation showing his involvement in the financing of the three properties.

SoCal filed additional declarations in support of its position that a receiver was needed and that Essary was qualified to serve as the receiver.

## I. August 20, 2018 Hearing

At the August 20 hearing, the court stated it would not address whether the July 31 order vacating the receiver was valid, rather the court was "starting fresh." Razuki's counsel then outlined Razuki's interest in the three businesses, expressing concern that Malan intended to immediately sell the real properties, and asserting Razuki had no confidence a truthful accounting could be done, particularly since the businesses were operated almost entirely in cash.[7] SoCal's counsel argued a damage award would be insufficient to remedy the breaches of its options for the real properties.

Malan's counsel repeated his argument that the Settlement Agreement was unenforceable as against public policy and also noted RM Property was never capitalized. He continued to assert there was no urgency requiring a receiver because all the asserted damages could be determined by an accounting. He also said that SoCal's poor management of the Dispensary had resulted in a default by the entity Property Owner (SD United) under the homeowners association settlement, irreparably harming the business.

---

[7] Razuki's counsel also asserted there was some indication that Malan and Hakim had given purchase options to Far West Operating, LLC (Far West) (which was the operator hired after Malan terminated SoCal in early July and was reinstated as the operator after July 31, 2018) and Synergy Management Partners, LLC (Synergy) (the company hired after July 31, 2018 to run the Mira Este production facility) that overlapped with SoCal's options, creating the risk of further litigation and additional need for the receiver.

Hakim's counsel refuted the validity of SoCal's options and confirmed the Planned Facility was not currently a marijuana operation.

Essary's counsel explained Essary's activity during his appointment from July 17 to July 31, and refuted defendants' assertions that Essary had not satisfied the regulatory requirements to manage the Dispensary and Production Facility operations.

After the conclusion of arguments, the court imposed a temporary receivership and set a further hearing for Friday, September 7 to consider the continued need for the receiver. The court stated Razuki had shown a likelihood of prevailing on the merits and that there was a risk of irreparable harm "based on the amount of money that allegedly ha[d] been put into this case." The court again appointed Essary as the receiver and directed him to keep the two existing managers (Synergy and Far West) in place as managers of the Production Facility and the Dispensary, respectively.

The court also entered orders specifying who Essary should hire as the accountant for the entities in the receivership. The court ordered Essary to file a report on September 5 and ordered the parties to file any additional supplemental briefing three days before the hearing. The court excluded the Planned Facility from the receivership, but imposed a TRO preventing the sale of this property.

On August 28, the court entered the order appointing Essary as the receiver over the Dispensary and Production Facilities, the entity owners of these properties, and their license holders.

### J. Briefing for September 7, 2018 Hearing

One week later, Hakim filed another supplemental brief, arguing the receivership had already caused irreparable harm to the Production Facility because producers and manufacturers were unwilling to work with the

21

business while it was under the control of the receiver. Hakim also asserted the new manager (Synergy) could soundly manage the facility and keep meticulous records for any required accounting, preventing any harm to Razuki. Finally, Hakim argued a $10 million dollar bond was appropriate.

In his supplemental brief, Malan continued to refute Razuki's interest in the three businesses.[8] Malan asserted the receivership was detrimental to the businesses and that the receiver had already proven too expensive. Malan also continued to allege malfeasance by Essary.

Malan's declaration outlined additional details about his relationship with Razuki, explaining that in 2014 he and Razuki began investing in properties together with a 75/25 split in Razuki's favor, and that they purchased 50 properties including a gas station and two marijuana dispensaries. Malan stated Razuki then refused to honor their arrangement and did not share rent proceeds as they agreed, resulting in the 2017 Settlement Agreement. Malan repeated his assertion he was tricked into signing that agreement and that he and Razuki agreed to rescind it in February 2018. Malan also stated for the first time that he and Razuki had then agreed to keep the properties they controlled, with Malan taking ownership of all of the assets under the control of the receiver.

Malan's attorney (Austin) submitted a declaration expressing concern over Essary's decision to hire a partner in the law firm representing SoCal, as the receiver's cannabis expert, rather than her recommended independent

---

[8] Malan lodged close to 100 exhibits consisting primarily of documents he asserted showed his control of the three businesses and related properties, e.g., cancelled checks, wire transfer receipts, and receipts for various business expenses, as well as documents from other lawsuits that allegedly showed Razuki's manipulation of the justice system to gain an advantage in real estate dealings.

expert. Austin also said the City's consultant who conducted an audit of the Dispensary had recently discovered an approximate $100,000 discrepancy while SoCal was the operator.

On September 5, Essary submitted his first receiver's report outlining his activity related to the Dispensary and the Production Facility.

## K. September 7 Order Confirming Receiver Appointment for 60 Days

At the September 7 hearing, the parties' counsel reiterated their positions at length.

Razuki's counsel emphasized the entirely cash nature of the businesses, noting the cash could be easily hidden. Malan's counsel countered that discovery was the proper mechanism for Razuki to obtain financial information about the businesses, and that most of the relevant information was in SoCal's possession. Malan's counsel continued to challenge Razuki's assertion he had invested millions into the businesses, and argued a remedy less drastic than a receiver would be more appropriate, such as requiring a forensic accountant to assess all of the business accounts and operations.

Hakim's counsel focused on the harm resulting if the receiver remained in place, emphasizing the inability to attract any producers, and citing the uncertainty the property could be sold and the risk that trade secrets would be disclosed. Hakim's counsel also suggested that Razuki's interest in the Production Facility property could be protected by requiring his portion of profits to be deposited into a separate account that the other parties could not access.

In response to the court's inquiry, Essary's attorney stated he did not think the receivership would prevent new producers from contracting at the Production Facility and any concern about the disclosure of trade secrets could be rectified with a nondisclosure agreement.

After considering the voluminous written record and the parties' oral arguments at the several hearings, the court confirmed its receivership decision. The court concluded Razuki had shown a sufficient probability of prevailing on his claims, and that based on the documentation submitted to the court there was a risk of irreparable harm requiring protection. The court appointed Essary as the receiver for an additional 60 days, after which it would reconsider the appointment, and ordered Essary to hire an outside accountancy firm to conduct a forensic accounting of the Production Facility, the Dispensary, and all of the interested parties' contributions to those businesses. The court ordered the receivership to remain over the same entities and ordered Razuki to post a bond of $350,000 within two weeks, with the existing order remaining in place until the bond was posted, and ordered that if the bond was not posted the receivership would be dissolved. The court directed the receiver's counsel to submit a final proposed order.

On September 13, the receiver's attorney submitted a proposed order. Seven days later, on September 20, Razuki filed notice he had posted the receivership bond of $350,000 on September 18.

On September 26, 2018, the court entered the order challenged in this appeal, entitled "Order Confirming Receiver and Granting Preliminary Injunction" (the September 26 order). The order confirmed Essary's appointment as receiver over two of the Property Owner entities (SD United and Mira Este); three license holder entities (Balboa Co-op, CCG, Devilish), and the business manager entity (Flip). The order required Essary to retain an independent accountant to conduct "a comprehensive forensic audit of the Marijuana Operations, as well as of all named parties in this matter as it relates to financial transactions between and among such parties related to

24

the issues in dispute." The order excluded the Planned Facility, lifting the prior restraining order preventing its sale.

### L. Notices of Appeal From the September 26 Order

Malan, SD United, Flip, and the three license holders (Balboa Co-op, CCG, and Devilish) filed their joint notice of appeal from the September 26 order on October 30, 2018. Hakim and the entities related to the Production Facility (Roselle and Mira Este) filed their joint notice of appeal from the order on November 2, 2018.[9]

## DISCUSSION

Malan and Hakim challenge the court's imposition of the receiver over the Dispensary and Production Facility related entities (SD United, Mira Este, Balboa Co-op, CCG, Devilish, and Flip).[10] Malan raises several errors in the process used to appoint the receiver and asserts that Essary is biased against him. Both appellants argue the court abused its discretion by appointing Essary, contending that Razuki did not show a sufficient probable interest in the assets placed under receivership and that the balance of harms did not favor him. Finally, Malan and Hakim assert the doctrine of unclean hands prevents the appointment of a receiver in this case.

---

[9] Our references to appellate arguments made by Malan and/or Hakim includes the entities related to each of these parties in their notices of appeal.

[10] Although the court's order appointing Essary is styled "Order Confirming Receiver and Granting Preliminary Injunction," neither Malan's nor Hakim's briefing challenges a preliminary injunction. Rather, appellants briefing exclusively seeks reversal of the trial court's order appointing the receiver and return to them of the properties, assets, and companies placed under the receiver's control in accordance with that order.

## I. Legal and Procedural Standards

## A. Receivership Standards and Procedure

The appointment of a receiver is a provisional equitable remedy. The receiver's role is to preserve the status quo between the parties while litigation is pending. (*Southern California Sunbelt Developers, Inc. v. Banyan Limited Partnership* (2017) 8 Cal.App.5th 910, 925.) Further, it is " 'an ancillary remedy which does not affect the ultimate outcome of the action.' " (*Ibid.*)

The court's role in supervising a receiver cannot be overstated. " 'The receiver is but the hand of the court, to aid it in preserving and managing the property involved in the suit for the benefit of those to whom it may ultimately be determined to belong.' [Citations.]" (*Marsch v. Williams* (1994) 23 Cal.App.4th 238, 248 (*Marsch*).) The receiver is the agent of the court and not of any party and, as such, is neutral, acts for the benefit of all who may have an interest in receivership property, and holds assets for the court rather than the parties. (*O'Flaherty v. Belgum* (2004) 115 Cal.App.4th 1044, 1092 (*O'Flaherty*); see *People v. Stark* (2005) 131 Cal.App.4th 184, 204; Cal. Rules of Court, rule 3.1179(a).)[11] Put another way, appointment of a receiver is a tool for the court to gain control over a chaotic ownership dispute like the turbulent situation Judge Sturgeon found when he was assigned to this case.

" 'In California, a receiver may not be appointed except in the classes of cases expressly set forth in the statutes or as authorized under established usage of the court's equitable powers.' [Citations.]" (*O'Flaherty, supra*, 115 Cal.App.4th at p. 1092.) Code of Civil Procedure section 564 generally sets

---

[11]    All rule references are to the California Rules of Court.

forth the statutory circumstances under which a receiver can be appointed.[12] (*Marsch*, *supra*, 23 Cal.App.4th at p. 248.)  Section 564, subdivision (b) states: "A receiver may be appointed by the court in which an action or proceeding is pending, or by a judge of that court, in the following cases," and then lists 12 particular circumstances that can support the appointment of a receiver.

Two of these circumstances are relevant here.  First, section 564, subdivision (b)(1) states:  "(1) In an action by a vendor to vacate a fraudulent purchase of property, or by a creditor to subject any property or fund to the creditor's claim, *or between partners or others jointly owning or interested in any property or fund, on the application of the plaintiff, or of any party whose right to or interest in the property or fund, or the proceeds of the property or fund, is probable, and where it is shown that the property or fund is in danger of being lost, removed, or materially injured.*"  (Italics added.)  Second, section 564, subdivision (b)(9) is a catchall, providing for the appointment of a receiver "[i]n all other cases where necessary to preserve the property or rights of any party."

"The requirements of [section 564] are jurisdictional, and without a showing bringing the receiver within one of the subdivisions of that section the court's order appointing a receiver is void." (*Turner v. Superior Court* (1977) 72 Cal.App.3d 804, 811.)  To invoke the authority of the court to appoint a receiver under section 564, subdivision (b)(1), the plaintiff must establish by a preponderance of the evidence a "joint interest with [the] defendant in the property; that the same was in danger of being lost, removed or materially injured, and that plaintiff's right to possession was probable." (*Alhambra-Shumway Mines, Inc. v. Alhambra Gold Mine Corp.* (1953) 116

---

12    Subsequent undesignated statutory references are to the Code of Civil Procedure.

Cal.App.2d 869, 873 (*Alhambra*).)  Lack of standing (here alleged to be lack of probable possession of the property) to seek a receivership is a jurisdictional defect that subjects the action to dismissal.  (*O'Flaherty*, *supra*, 115 Cal.App.4th at p. 1095.)

Importantly, "[t]he trial court on the motion for receivership is not required to determine the ultimate issues involving the precise relationship of the parties.  At this stage of the proceedings, nothing more than a probable joint or common interest in the property concerned need be shown." (*Maggiora*, *supra*, 249 Cal.App.2d at p. 711.)  " 'Evidence to justify the appointment of a receiver may be presented "in the form of allegations in a complaint or other pleading, by affidavit or by testimony." ' " (*Republic of China v. Chang* (1955) 134 Cal.App.2d 124, 132, italics removed.)

Procedurally, the Code of Civil Procedure and the Rules of Court set two paths for obtaining a receiver.  A party seeking the appointment of a receiver can do so either on an ex parte basis, or by noticed motion.  Under either path, the substantive requirements for appointment of the receiver under section 564 are the same.  Additional procedural protections, however, are required under the Rules of Court when an applicant proceeds on an ex parte basis.

Under rule 3.1175(a)(1), a plaintiff seeking a receiver on an ex parte basis, must show by declaration "[t]he nature of the emergency and the reasons irreparable injury would be suffered by the applicant during the time necessary for a hearing on notice."  In addition, the applicant must show, by declarations or a verified pleading, (1) the names and contact information for "the persons in actual possession of the property"; (2) "[t]he use being made of the property by the persons in possession"; and (3) "[i]f the property is a part of the plant, equipment, or stock in trade of any business, the nature and

28

approximate size or extent of the business and facts sufficient to show whether the taking of the property by a receiver would stop or seriously interfere with the operation of the business." (Rule 3.1175(a)(2)-(4).) If any of this information is "unknown to the applicant and cannot be ascertained by the exercise of due diligence, the applicant's declaration or verified complaint must fully state the matters unknown and the efforts made to acquire the information." (*Ibid.*)

In addition to the requirements of rule 3.1175, when an applicant proceeds on an ex parte basis, section 566, subdivision (b) requires an undertaking in an amount fixed by the court before imposing the receivership order. At the ex parte hearing, the applicant must propose specific amounts, and the reasons for the amounts proposed, of the undertakings required from the applicant by section 566, subdivision (b) and from the receiver by section 567, subdivision (b). (Rule 3.1178.)

If a receiver is appointed on an ex parte basis, the matter "must be made returnable upon an order to show cause why appointment should not be confirmed." (Rule 3.1176, subd. (a).) The OSC must be set within 15 days, "or if good cause appears to the court," within 22 days of appointment of the receiver. (*Ibid.*) On an OSC, or a noticed motion, the applicant's moving papers must allege sufficient facts establishing one of the statutory grounds for the appointment, as well as irreparable injury and the inadequacy of other remedies. (*Alhambra, supra,* 116 Cal.App.2d at p. 873.) The court has discretion to require the applicant to post a bond if the receivership is confirmed, but unlike at the ex parte stage, the bond is not statutorily required. Under section 567, subdivision (b) the receiver must maintain a bond under either procedure.

## B. Standard of Review

"Where there is evidence that the plaintiff has at least a probable right or interest in the property sought to be placed in receivership and that the property is in danger of destruction, removal or misappropriation, the appointment of a receiver will not be disturbed on appeal." (*Sachs v. Killeen* (1958) 165 Cal.App.2d 205, 213 (*Sachs*).)  "The discretion of the trial court is so broad that an order based upon facts concerning which reasonable minds might differ with respect to the necessity for the receiver will not be reversed. [Citation.]  To justify our interference, it must clearly appear that the appointment was an arbitrary exercise of power [citation]." (*Maggiora*, *supra*, 249 Cal.App.2d at pp. 710-711; see also *Breedlove v. J.W. & E.M. Breedlove Excavating Co.* (1942) 56 Cal.App.2d 141, 143 ["[W]here a finding, based upon conflicting evidence, is to the effect that danger is threatened to property or funds, and the appointment of a receiver is made, it is seldom that the reviewing court will hold that the lower tribunal has been guilty of an abuse of the discretion confided to it."].)

## II. Procedural Challenges to the Order Appointing Essary

Because of the peremptory challenges and their attendant judicial reassignments, the procedure followed in this case did not precisely align with the conventional paths laid out by the rules.  After Razuki obtained the initial appointment of the receiver on July 17 on an ex parte basis, the confirmation process required by rule 3.1176, subdivision (a) was short-circuited.  Before the receivership could be confirmed through the issuance of an OSC, the receivership was vacated by Judge Strauss on July 31.  That order was then interrupted by SoCal's peremptory challenge and Judge Sturgeon began the ex parte proceedings anew.

30

Although no order clarified whether the parties were to proceed by way of noticed motion or on an ex parte basis, the timeline of events generally followed the ex parte and confirmation by OSC procedure set forth in rules 3.1175 and 3.1176. Of note, at the August 20 hearing, the court stated that the next hearing should occur "within 15 to 20 days" and set the hearing for September 7 to consider the continuation of the receivership and the bond amount that should be required from Razuki. Further, no party filed a noticed motion with respect to the appointment of (or request to vacate) the receiver.

## A. Failure to Require Undertaking

Malan first asserts that the initial order imposing the receiver issued by Judge Medel on July 17 was void because it "did not require an undertaking from the applicant *before* the order would take effect," and that every order thereafter was void as a result. (Italics added.) Malan also argues that Razuki failed to post a bond before Judge Sturgeon imposed the receivership a second time on August 20, again violating section 566 and voiding the September 26 order confirming the receivership at issue in this appeal.

Malan's arguments are not well taken. Section 566, subdivision (b) states, "if a receiver is appointed upon an ex parte application, the court, before making the order, must require from the applicant an undertaking in an amount to be fixed by the court, to the effect that the applicant will pay to the defendant all damages the defendant may sustain by reason of the appointment of the receiver and the entry by the receiver upon the duties, in case the applicant shall have procured the appointment wrongfully, maliciously, or without sufficient cause." As has been described, Razuki proceeded by ex parte application. The initial order issued by Judge Medel

31

provided Razuki a five-day grace period.  Razuki, however, posted the bond *the day the order was issued*, satisfying the statute's requirement.

Even if we were to conclude the initial receivership was invalid because it gave Razuki five days to post an undertaking, we do not agree with Malan's contention that the September 26 order is therefore void.

To advance this argument, Malan relies on *Bibby v. Dieter* (1910) 15 Cal.App. 45, which held an order appointing a receiver upon an ex parte application without the required undertaking is void *and all subsequent orders arising from that appointment order are void*.  This case is not governed by this rule because the challenged receivership order did not arise from the initial appointment order claimed to be void.  Instead, after the two successful peremptory challenges, Judge Sturgeon made clear he was considering the receivership petition anew.  The court had the full authority to vacate the earlier orders and rule on the petition as a matter of first impression.  (See, e.g., *Wiencke v. Bibby* (1910) 15 Cal.App. 50, 53  [" 'The power of a court to vacate a judgment or order void upon its face is not extinguished by lapse of time, but may be exercised whenever the matter is brought to the attention of the court. . . .  The court has full power to vacate such action on its own motion and without application on the part of anyone.' "]; *State of California v. Superior Court (Flynn)* (2016) 4 Cal.App.5th 94, 100 ["Even without a change of law, a trial court has the inherent power to reconsider its prior rulings on its own motion at any time before entry of judgment."].)

Malan alternatively asserts that Judge Sturgeon's August 20 order appointing Essary for the second time was void because it did not require another undertaking by Razuki before it took effect.  However, Malan does not explain why the initial $10,000 bond filed by Razuki was insufficient to

satisfy section 566. While a dispute existed when the case was reassigned to Judge Sturgeon about whether that receivership was vacated by Judge Strauss on July 31 because no final order was signed, the record shows that Razuki's undertaking remained in place through September 19, 2018, when Razuki filed notice he had posted the $350,000 undertaking.[13] We presume the court was aware of the bond, which satisfied section 566. (See *Howard v. Thrifty Drug & Discount Stores* (1995) 10 Cal.4th 424, 443 [" 'We uphold judgments if they are correct for any reason, "regardless of the correctness of the grounds upon which the court reached its conclusion." ' "]; *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133, ["A judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness."])[14]

## B. Failure to Timely Serve First Amended Complaint

In a similar vein, Malan argues that Razuki's failure to serve defendants with the first amended complaint within five days of the July 17

---

[13]    Despite the lack of a final order after the July 31 hearing, the record also shows Essary and the defendants treated the receivership as being vacated that day. For example, the Dispensary and Production Facility resumed operations that day without any oversight by Essary. On appeal, no party suggests the July 31 order was not effective because it was not final.

[14]    Malan also argues the September 26 order violated section 566 because it gave Razuki 14 days to post the $350,000 bond ordered on September 7, 2018. However, there is no bond requirement on the applicant for an order confirming the receivership. (§ 566, subd. (b); see § 41:7. Undertakings, bonds, receiver's oath, and related claims, 12 Cal. Real Est. § 41:7 (4th ed.) [No similar statutory requirement to file an undertaking where the application for appointment of receiver is made on a noticed motion or for the confirmation of an order appointing a receiver on an ex parte basis.].) Rather a bond may be imposed at the court's discretion.

order, as required by rule 3.1176(b)-(c), requires reversal of the September 26, 2018 order.

Rule 3.1176(b) states that when a receiver is appointed on an ex parte basis, service of the complaint, notice of the OSC, and any supporting memorandum and declarations "must be made as soon as reasonably practical, but no later than 5 days after the date on which the order to show cause is issued, unless the court orders another time for service." Under rule 3.1176(c), if the applicant fails to "exercise diligence to effect service upon the adverse parties as provided in (b), the court may discharge the receiver."

Razuki provided the trial court with a reasonable explanation for the delay in serving the first amended complaint. He explained he was unable to obtain a conformed copy from the court's business office because of its backlog and that after the case was reassigned to Judge Strauss, his ex parte hearing to obtain an order from the court to require the court's business office to expedite return of the conformed pleading was taken off calendar. Razuki explained to the trial court that after the case was reassigned, he obtained a new ex parte hearing before Judge Strauss to expedite processing of the complaint. This evidence established Razuki's diligence in attempting to serve defendants. Further, any error was mooted by Judge Strauss's July 31 order vacating the receiver and Judge Sturgeon's August 14, 2018 order declining to reinstate Essary. Malan's argument does not support reversal of the September 26 order.

## C. Failure to Schedule OSC Hearing Within 22 Days of July 17 Order

Malan also argues the court's failure to make the OSC returnable within 15 days of the July 17 order appointing Essary, as required by rule 3.1176, voids the receivership. This argument lacks merit.

34

Rule 3.1176(a) requires the OSC to "be made returnable on the earliest date that the business of the court will admit, but not later than 15 days or, if good cause appears to the court, 22 days from the date the order is issued." (Rule 3.1176 (a).) At the time it instituted the first receivership on July 17, the court did set the hearing on the OSC outside the rule time. The OSC, however, was vacated after Malan filed his peremptory challenge to Judge Medel, mooting the purported violation of rule 3.1176(a). Further, Malan has provided no legal authority or argument to support his assertion that this technical error requires reversal of the later receivership order that is before this court on appeal.[15] (See *Mansell v. Board of Administration* (1994) 30 Cal.App.4th 539, 545-546 (*Mansell*) [appellate court need not furnish argument or search the record to ascertain whether there is support for appellant's contentions].)

### III. Receiver's Alleged Bias and Rule 3.1179(b)

Malan next contends that Essary was improperly biased against him and that Razuki and Essary violated rule 3.1179(b), which prohibits a receiver from making an agreement with the party seeking the receiver to hire particular service providers. Razuki responds that the trial court considered these allegations, and properly rejected them in view of all of the evidence.

Rule 3.1179(b) states: "The party seeking the appointment of the receiver may not, directly or indirectly, require any contract, agreement,

---

[15] Malan's assertion that the court violated rule 3.1176(a) at the August 20 hearing by setting the next hearing to confirm its appointment of Essary 18 days later is also without merit. The hearing was within the rule limit of 22 days and Malan does not challenge the existence of good cause to set the hearing beyond 15 days.

arrangement, or understanding with any receiver whom it intends to nominate or recommend to the court, and the receiver may not enter into any such contract, arrangement, agreement, or understanding concerning: [¶] (1) The role of the receiver with respect to the property following a trustee's sale or termination of a receivership, without specific court permission; [¶] (2) How the receiver will administer the receivership or how much the receiver will charge for services or pay for services to appropriate or approved third parties hired to provide services; [¶] (3) *Who the receiver will hire, or seek approval to hire, to perform necessary services*; or [¶] (4) What capital expenditures will be made on the property." (Italics added.) The rule contains no remedy for a violation, and does not require the court to void the receivership if it is violated.

The record shows the order issued by the court ensured the receiver was exercising independent authority in determining who to hire and how to manage the assets. Further, Malan points to no evidence of the existence of any agreement or understanding between Razuki and Essary concerning who Essary would hire if appointed. The court's rejection of Malan's argument that there was an agreement between Razuki and Essary that violated rule 3.1179(b)(3) was not an abuse of discretion.

With respect to Malan's assertion that Essary was biased against him, Malan points out that the initial July 17 order signed by Judge Medel authorized the receiver "to bind the Marijuana Operations to the terms of the Management Agreement . . . with SoCal . . . ." This order, however, was replaced and is not before this court on appeal.

The record shows that Judge Sturgeon was careful with respect to SoCal's continued role in the businesses. At the August 20 hearing, and as reflected in the court's written orders, Judge Sturgeon specifically prohibited

36

Essary from hiring SoCal, instead directing the receiver to keep the new managers (Far West and Synergy), who were favored by Malan and Hakim, in place as the operators of the Dispensary and the Production Facility. As the court directed, Essary maintained those entities in place after his August 20 appointment. There is no support in the record for Malan's position that the court abused its discretion by appointing Essary, that Essary's actions showed bias in favor of Razuki, or that Essary violated rule 3.1179(b) after his August 20 appointment.[16]

## IV. No Abuse of Discretion on Section 564, subdivision (b)(1) Issues

Malan and Hakim both argue in different ways that the court was required to determine whether Razuki showed a probability of success on the merits of his claims. Hakim asserts that "the trial court abused its discretion in appointing a receiver because the probability of success at trial between Razuki on the one hand and [the Production Facility entities (Mira Este and CCG)] on the other hand indisputably favors" these entities. Malan argues the Settlement Agreement "is void for violating public policy at the time it was created, so [Razuki] has not shown the requisite likelihood of success on the merits."

To appoint a receiver, however, the trial court was not required to determine the probability of success on any particular claim. Rather, as set forth above, to invoke the court's authority to appoint a receiver under section 564, subdivision (b)(1), a plaintiff seeking a receiver must establish by a

---

[16] The record does show the cannabis industry in San Diego is relatively small and many of the players in this litigation had existing relationships. For example, as SoCal argued below, Austin introduced Malan and Hakim to her client Jerry Baca, who formed Synergy in late August 2018 with Austin's counsel for the purpose of managing the Production Facility.

preponderance of the evidence a "joint interest with [the] defendant in the property; that the same was in danger of being lost, removed or materially injured, and that plaintiff's right to possession was probable."[17] (*Alhambra, supra*, 116 Cal.App.2d at p. 873; see *Maggiora, supra*, 249 Cal.App.2d at p. 711.)

Contrary to appellants' arguments, the trial court was "not required to determine the ultimate issues involving the precise relationship of the parties. At this stage of the proceedings, nothing more than a probable joint or common interest in the property concerned need be shown [citations]." (*Maggiora, supra*, 249 Cal.App.2d at p. 711.) Notably, an interest in the profits of a concern is "a significant factor in determining the necessity of a receiver [citation]. . . ." (*Id.* at p. 711, fn. 3.)

## A. Razuki's Interest in Dispensary and Production Facility Entities

Malan and Hakim argue the receivership order must be vacated because Razuki failed to show a sufficient interest in the entities over which the receiver was appointed to satisfy section 564, subdivision (b)(1). Further, they contend that the catchall provision of section 564, subdivision (b)(9) is unavailable because Razuki chose to proceed under subdivision (b)(1).

Razuki responds that the Settlement Agreement, enforceable or not, is evidence of an oral partnership agreement with Hakim and his significant interest in the Dispensary and the Production Facility. Further, his declarations and the attached documentation showed his significant financial

---

17 Hakim cites one case addressed to the probability of prevailing, *Teachers Ins. & Annuity Assn. v. Furlotti* (1999) 70 Cal.App.4th 1487, 1493 (*Teachers*). *Teachers*, however, was an appeal of a preliminary injunction requiring the defendant to remove a fence in a shared easement. (*Id.* at pp. 1490-1492.)

contributions to these businesses. We agree with Razuki that these facts supported the trial court's determination that he had standing to pursue a receiver under section 564, subdivision (b)(1) over the Dispensary and Production Facility, and the various entities that served the two businesses.[18]

The evidence presented to the trial court satisfied the requirement that Razuki show a probable interest in the assets. Razuki's declaration attached the executed Settlement Agreement memorializing his interest in the operations of both the Dispensary and the Production Facility, specifically his right to receive profits from those entities through the mechanism of RM Property. In addition, Razuki's declaration outlined the background of the Settlement Agreement and the underlying partnership with Malan, which showed their agreement to share the profits from their joint ventures. Indeed, Malan's own declaration recounted his longstanding arrangement with Razuki whereby profits in their real estate investments were split 75/25 in favor of Razuki.

Razuki also submitted documentation showing the collateral he pledged to secure the purchase and refinancing of the Production Facility property; his cash investments of over $450,000 in this property and the facility's licensure; and documentation showing the transfer of the Dispensary property from an entity wholly owned by him to SD United. Although Malan and Hakim submitted documentation showing their own

_____

[18]    Malan makes passing reference in his brief to the inclusion of Devilish in the receivership as improper because the title owner (Roselle) was excluded and Devilish was formed to hold Roselle's licenses. However, despite the exclusion of Roselle, Devilish was explicitly named as a party to the management agreement with SoCal for the Production Facility, bringing Devilish within the purview of the receivership.

investments in the properties and businesses, the documents did not refute Razuki's evidence of his own interest.

These facts distinguish the case from *Rondos v. Superior Court of Solano County* (1957) 151 Cal.App.2d 190, relied upon by appellants. In *Rondos*, one of two owners of a business licensed by the Department of Alcoholic Beverage Control (ABC), Marvin Caesar, contracted to sell his stake to Edward Essy with the consent of the other owner, George Rondos. When the required application to transfer the business was not approved by ABC within a year, Rondos served Essy with notice of rescission of the contract for sale and notified ABC that he was withdrawing the application for transfer. Essy brought suit and obtained the appointment of a receiver over the business. (*Id*. at p. 193.) The Court of Appeal reversed the receivership order, holding that Essy had failed to establish a probable interest under section 564, subdivision (1) (the identical predecessor to (b)(1)). (*Rondos*, at pp. 194-195.) Critically, the parties' contract explicitly stated the transfer of Caesar's interest to Essy would not occur until ABC approved the transfer. (*Id*. at p. 194.) No similar uncontroverted evidence exists in this case that would have precluded the trial court's finding that Razuki had shown a probable interest in the assets at issue.

Malan and Hakim point to no evidence showing Razuki's contributions to the businesses did not occur, or that Razuki made them without expectation of sharing in the profits. The trial court was tasked with making a preliminary determination as to whether Razuki was a partner or investor in these assets with a *probable* interest in them. There was sufficient evidence before the court supporting its determination that Razuki had satisfied this standard. (See *Maggiora, supra*, 249 Cal.App.2d at p. 711 ["At this stage of the proceedings, nothing more than a probable joint or common

40

interest in the property concerned need be shown . . . ."]; see also *Eng v. Brown* (2018) 21 Cal.App.5th 675, 694 ["In general, 'the association of two or more persons to carry on as coowners a business for profit forms a partnership, whether or not the persons intend to form a partnership.' (Corp. Code, § 16202, subd. (a).) With certain exceptions, '[a] person who receives a share of the profits of a business is presumed to be a partner in the business . . . .' . . . "].) It is not this court's role to second guess that determination.

Appellants' claim that Razuki lacks a sufficient interest to obtain a receiver bears a resemblance to the issue decided in *Sachs*, an appeal from the confirmation of a receiver after an ex parte appointment. (*Sachs, supra,* 165 Cal.App.2d at p. 207.) There, the defendants "urge[d] that the written agreement" giving plaintiff, the inventor of a device "to regulate the speed of electric motors," a percentage of net profits in the manufacturing and sale of the device "created neither a partnership nor a joint venture." (*Id.* at p. 213.) The defendants asserted that the plaintiff was "in the position of an unsecured creditor suing at law to recover a debt." (*Ibid.*) The trial court rejected this argument, concluding even if it was an accurate analogy, it did not preclude the receivership because "[t]he action is not one of law, but is essentially an equitable action to obtain an accounting and establish a constructive trust." (*Ibid.*)

In affirming, the *Sachs* court recognized the defendants had submitted conflicting evidence, denying that the plaintiff invented the device and contending he stole it from his employer, and asserting the profit sharing agreement was unenforceable because the plaintiff had failed to uphold his obligation to do certain "experimental and design work." (*Sachs, supra,* 165 Cal.App.2d at p. 210.) However, the court concluded the plaintiff's assertion

41

that he entered into the agreement with the defendants was sufficient under the receivership statute to support the trial court's finding that the plaintiff had shown a probable interest in the business. (*Id*. at p. 213.)

As in *Sachs*, defendants here submitted evidence contradicting Razuki's claim to the property and profits of the Dispensary and Production Facility. This conflicting evidence, however, does not establish the court abused its discretion by crediting Razuki over defendants and finding Razuki had shown a probable right to possession at this stage of the litigation.

For these same reasons, we reject Malan's assertion that Razuki's failure to transfer his pledged interests in Super 5 and Sunrise to RM Property, as contemplated by the Settlement Agreement, precludes appointment of the receiver.[19] This fact does not conclusively establish that Razuki lacked a probable interest in the assets placed in receivership. Rather, it was one fact among many conflicting facts about Razuki's ownership.[20]

## B. Enforceability of Settlement Agreement As Against Public Policy

Malan argues the Settlement Agreement is void because it was against public policy when it was entered and therefore Razuki "has not shown the requisite likelihood of success on the merits." Malan also argues the explicit

---

[19] We also reject Malan's contention that Razuki's failure to join Super 5 and Sunrise as indispensable parties precludes his claims. Malan fails to provide any legal argument in support of this position. (*Mansell*, *supra*, 30 Cal.App.4th at pp. 545-546.)

[20] We do agree with Hakim and Malan that proceeding under one of the more specific provisions of section 564 precludes reliance on the catchall provision of subdivision (b)(9). (See *Marsch*, *supra*, 23 Cal.App.4th at p. 246, fn. 8.) However, because we affirm the trial court's finding under subdivision (b)(1), we need not address the issue.

protection for contracts involving cannabis businesses afforded by Civil Code section 1550.5 are not applicable because the law became effective after the Settlement Agreement was executed.

As discussed, the law applicable to the appointment of a receiver does not require the plaintiff to show a likelihood of prevailing on the merits of his claims. Rather, Razuki was required to show a probable right to the assets placed in receivership and that "the same was in danger of being lost, removed or materially injured . . . ." (*Alhambra, supra,* 116 Cal.App.2d at p. 873.) Further, the trial court "is not required to determine the ultimate issues involving the precise relationship of the parties." (*Maggiora, supra,* 249 Cal.App.2d at p. 711.)

Malan's assertion that the Settlement Agreement is unenforceable because it was against the public policy of this state at the time it was entered, does not convince us the trial court abused its discretion by appointing the receiver. "Anything that has a tendency to injure the public welfare is, in principle, against public policy. But to determine what contracts fall into this vague class is exceedingly difficult. It has been frequently observed that the question is primarily for the Legislature, and that, in the absence of a legislative declaration, a court will be very reluctant to hold the contract void." ([§ 453] General Principle., 1 Witkin, Summary 11th Contracts § 453 (2020); see also *Moran v. Harris* (1982) 131 Cal.App.3d 913, 919-920, quoting *Stephens v. Southern Pacific Co.* (1895) 109 Cal. 86, 89-90 [" ' "The power of the courts to declare a contract void for being in contravention of sound public policy is a very delicate and undefined power, and, like the power to declare a statute unconstitutional, should be exercised only in cases free from doubt." [Citation.] . . . "No court ought to refuse its aid to enforce a contract on doubtful and uncertain grounds. The burden is on

43

the defendant to show that its enforcement would be in violation of the settled public policy of this state, or injurious to the morals of its people." [Citation.]' "].)

As an initial matter, Razuki's claims are not entirely reliant on the enforceability of the Settlement Agreement. Razuki sought the receiver appointment to protect his rights to the real properties and to the past and potential profits derived from the Dispensary and the Production Facility. He seeks to enforce those rights not only by way of the Settlement Agreement, but also by enforcement of his oral partnership agreement with Malan.

Additionally, the Settlement Agreement on its face does not concern the operations of a recreational marijuana business, which could arguably have been classified as illegal at the time the agreement was executed. The agreement's first recital states: "RAZUKI and MALAN have engaged in several business transactions, dealings, agreements (oral and written), promises, loans, payments, related to the acquisition of real property and interests in various *medical marijuana* businesses. Specifically, RAZUKI and MALAN have each invested certain sums of capital for the acquisition of the following assets . . . ." (Italics added.) At the time the contract was entered, business related to the provision of *medical marijuana* was lawful and not against this state's public policy.

In addition, the fact that marijuana use remains a violation of federal law does not necessarily establish the contract is unenforceable. Even if a dispute involves an "illegal contract" it can "be enforced in order to 'avoid unjust enrichment to a defendant and a disproportionately harsh penalty upon the plaintiff.' " (*Asdourian v. Araj* (1985) 38 Cal.3d 276, 292.) " ' "[T]he extent of enforceability and the kind of remedy granted depend upon a

44

variety of factors, including the policy of the transgressed law, the kind of illegality and the particular facts." ' " (*Ibid.*)

The trial court was tasked with making an early determination concerning the necessity of a receiver to protect the real property and other assets at issue. The court was not charged with determining the ultimate issue of enforceability of the Settlement Agreement and its failure to reach this issue to preclude Razuki's claims at this stage was not an abuse of discretion.[21]

## C. Necessity of Derivative Action

Malan also argues that Razuki lacks standing to enforce the Settlement Agreement and that his claims should have been brought as a derivative action on behalf of RM Property. This argument misconstrues the claims asserted by Razuki. Razuki seeks to enforce the Settlement Agreement and his oral partnership agreement. Razuki's claims are not that Malan and Hakim defrauded RM Property. Rather he alleges that Malan breached the Settlement Agreement and that Malan and Hakim otherwise engaged in illegal and fraudulent conduct to prevent Razuki from obtaining the benefits of his partnership with Malan. Contrary to Malan's assertion, these claims are not necessarily derivative and were properly brought by Razuki on his own behalf. (See *Schuster v. Gardner* (2005) 127 Cal.App.4th 305, 312

---

[21] Malan also relies on Civil Code section 1550.5 (recognizing the lawfulness of certain medicinal and/or adult-use cannabis commercial activity) and the fact that the law did not take effect until January 1, 2018, almost two months after the Settlement Agreement was executed. Although the statute's existence may be a factor in determining the enforceability of the Settlement Agreement and/or the alleged oral agreement, it did not preclude the receiver appointment at this early stage of the litigation.

45

[A " '*derivative* action [is] filed on *behalf of the corporation* for injury to the corporation for which it has failed or refused to sue.' "].)

## V.  Imminent Injury and Availability of Less Dramatic Relief

Malan and Hakim contend the court erred by determining the balance of harms favored Razuki and SoCal's request for a receiver.  They primarily argue that events occurring after the appointment—the Production Facility's failure to obtain new clients—demonstrate why the trial court was incorrect in finding there was a risk to Razuki's interest during the pendency of this litigation.  Malan also asserts there was no evidence of any risk of destruction to the businesses' operations or the property.  Further, Malan and Hakim both contend that lesser remedies were available to protect Razuki's interests.

Razuki responds that the risk of harm to his interest was significant because ownership of the cannabis operations, in particular the property that was permitted for such operations, "is a unique asset that cannot easily be replicated or otherwise replaced with money damages.  Specifically, an ownership or equitable interest in those businesses and related facilities also grants an interest in the licenses and [CUPs] which allow those marijuana businesses to operate legally in San Diego.  As the number of such licenses is rigorously restricted, the ownership of those business is a unique and irreplaceable asset."  Further, Razuki points to the cash nature of the businesses, which makes accounting for and after-the-fact tracing of profits particularly difficult.  Because of these facts, Razuki contends the trial court did not abuse its discretion by finding that a receivership was necessary to protect his stake in the enterprise while his claims proceed through the court. We agree.

To appoint a receiver under section 564, subdivision (b)(1), the trial court must determine whether the "property or fund is in danger of being lost, removed, or materially injured." "[T]he availability of other remedies does not, in and of itself, preclude the use of a receivership. (*Sibert v. Shaver* [(1952)] 113 Cal.App.2d 19, 21.) Rather, a trial court must consider the availability and efficacy of other remedies in determining whether to employ the extraordinary remedy of a receivership." (*City and County of San Francisco v. Daley* (1993) 16 Cal.App.4th 734, 745.)

Contrary to Malan and Hakim's assertions on appeal, at the time the trial court confirmed the receivership, there was substantial evidence presented by Razuki suggesting that his investment in the dispensary and production facility was in jeopardy as a result of defendants' actions. The court had before it competing claims of ownership by Razuki and SoCal, and at least one separate pending lawsuit to quiet title over the Dispensary property. In addition, the initial receiver appointment in July had resulted in allegations that Malan and his counsel had directed Dispensary employees to take significant amounts of cash from the businesses.

Other facts before the court also suggested the property itself was in jeopardy of destruction. For instance, SoCal submitted the affidavit of a witness who saw the illegal transportation of cannabis products to the Production Facility, potentially jeopardizing the facility's permit. Malan and Hakim argued that SoCal's employees were also jeopardizing the viability of the dispensary through their mismanagement. There were also competing claims on the valuable equipment in the production facility, and threats it would be sold or destroyed.

When the unique character of this real property is considered in conjunction with the erratic behavior of the various parties leading to the

47

September 7 hearing, the trial court's determination that there was a significant risk of irreparable harm to these assets requiring a neutral third party to step in was not an abuse of its wide discretion. In addition, the all-cash nature of the Dispensary and Production Facility, combined with a specific claim that cash had already been misappropriated from the Dispensary without proper accounting, supported the trial court's conclusion there was a risk of irreparable harm to the assets during this litigation. (See *Moore v. Oberg* (1943) 61 Cal.App.2d 216, 221-222 (*Moore*) ["So broad is the discretion of the trial judge that his order based upon facts concerning which reasonable minds might differ with respect to the necessity for the receivership will not be reversed. We cannot substitute our conclusion for that of the trial court made upon sufficient evidence even if we should be of the opinion that there was no danger of the loss or removal of, or other irreparable injury to, the assets of the joint venture. To justify our interference with the order confirming the appointment herein, it must be made clearly to appear that the order was an arbitrary exercise of power."].)

With respect to Malan and Hakim's argument that the receivership has harmed the assets since September 26, 2018, it is not this court's role to review the activity that took place after the appealed order. (*Bach v. County of Butte* (1989) 215 Cal.App.3d 294, 306 (*Bach*).) This information was not before the trial court when it confirmed Essary's appointment and thus is not

48

a proper basis for reversal of the order.[22]  Hakim also argues that the appointment was unnecessary because after July 10, the Production Facility had generated no profits, and thus there was nothing for the receiver to manage.  This argument does not assist Hakim.  Rather it highlights the contradictions that were facing the trial court, including Hakim's and Malan's assertions that Synergy had secured profitable contracts before Essary's appointment.  The argument also casts doubt on appellants' assertions that the receiver is the reason for the facility's lack of profit.

In sum, the receivership was an appropriate remedy for the court to track the cash the parties stated was flowing, and that had flowed, through the two operations; control the parties' chaotic ownership disputes; and protect the real property jeopardized by the parties' conduct.  While the other remedies appellants suggest might also have protected Razuki's interest, Malan and Hakim have not shown the court's decision to confirm the receiver was "an arbitrary exercise of power."  (*Moore*, *supra*, 61 Cal.App.2d at p. 222.)

## VI.  Unclean Hands

### A.  Background

Finally, Malan and Hakim ask this court to overturn the September 26 order based on the federal criminal charges that Razuki now faces.  In support of their argument, Malan and Hakim included in the Appellants' Appendix briefing and declarations for Hakim's May 8, 2019 "Ex Parte

---

[22]    For the same reason, Hakim's motion to augment the record to include subsequent reports of the receiver and related documentation is denied.  (See *In re Marriage of Folb* (1975) 53 Cal.App.3d 862, 877, disapproved on other grounds by *In re Marriage of Fonstein* (1976) 17 Cal.3d 738, ["But we must reiterate that matters occurring after judgment are generally not reviewable on appeal . . . .  The trial court remains the more appropriate forum in which to litigate these subsequent developments."].)

49

Application to Remove Receiver from [Production] Facility . . . ." These documents include Malan's declaration attaching the criminal complaint filed against Razuki in the Southern District of California, *United States of America v. Razuki*, case No. 3:18-mj-05915-MDD (S.D.Cal. 2018) and the related grand jury indictment. The probable cause statement accompanying the complaint describes an FBI sting operation in which two women who Malan describes as Razuki's employees, hired the FBI's confidential informant to kidnap and murder Malan.

The statement explains that one of the women, Sylvia Gonzalez, first met with the FBI informant on October 17, 2018, and at a subsequent meeting on November 5, 2018, told the informant that she wanted to get rid of Malan because it looked like "they [we]re going to appeal" and Razuki "has a lot of money tied up right now, and he's paying attorney fees." The statement describes several additional meetings between the women and the informant where they discussed a plan to kidnap Malan and take him to Mexico where they would murder him. Razuki was alleged to be present at one meeting, but not directly involved in conversations concerning the murder plot.

According to the statement, Gonzalez contacted the informant on November 13, 2018, to tell him that Malan would be at the San Diego Superior Court that day and on November 15, 2018, the informant met with Razuki and told him that he "took care of it." During the November 15, 2018 meeting, the informant requested payment from Razuki, who told the informant to ask Gonzalez. Gonzalez, the other woman, and Razuki were all arrested over the course of the next day. The criminal complaint contains two charges against Razuki, conspiracy to kidnap and conspiracy to murder in a jurisdiction outside the United States.

50

Hakim also asserts that in June 2017 Razuki threatened "to burn down the Mira Este facility," when Hakim refused to lend Razuki the $518,000 in proceeds Hakim received from the cash-out refinance on that property.

## B. Analysis

"The defense of unclean hands arises from the maxim, ' " 'He who comes into Equity must come with clean hands.' " ' [Citation.] The doctrine demands that a plaintiff act fairly in the matter for which he seeks a remedy. He must come into court with clean hands, and keep them clean, or he will be denied relief, regardless of the merits of his claim. [Citations.] The defense is available in legal as well as equitable actions. [Citations.] Whether the doctrine of unclean hands applies is a question of fact." (*Kendall-Jackson Winery, Ltd. v. Superior Court* (1999) 76 Cal.App.4th 970, 978 (*Kendall-Jackson*).)

"Any conduct that violates conscience, or good faith, or other equitable standards of conduct is sufficient cause to invoke the doctrine. [Citations.] [¶] The misconduct that brings the unclean hands doctrine into play must relate directly to the cause at issue. Past improper conduct or prior misconduct that only indirectly affects the problem before the court does not suffice. . . . The misconduct 'must relate directly to the transaction concerning which the complaint is made, i.e., it must pertain to the very subject matter involved and affect the equitable relations between the litigants.' " (*Kendall-Jackson, supra*, 76 Cal.App.4th at p. 979.)

Without any question, the conduct alleged in the federal complaint as well as the allegation that Razuki threatened to burn down the Mira Este facility is powerful evidence that could form the basis for the unclean hands doctrine defense. Critically, however, none of this information was before the trial court at the time it entered the receivership order challenged in this

51

appeal. Malan and Hakim do not dispute that the kidnap and murder conspiracy allegations first came to light in November 2018, almost two months after the issuance of the appealed order. Additionally, Hakim's only citation in the record to the threat he alleges Razuki made in 2017 to burn down the Production Facility is contained in his declaration in support of his May 8, 2019 ex parte application to remove the receiver, more than six months after the issuance of the appealed order.

This court's role is to evaluate the ruling that was appealed by Malan and Hakim, not events that came later and that were not considered by the trial court. Malan and Hakim present no basis for this court to consider this new information.[23] (See *Bach*, *supra*, 215 Cal.App.3d at p. 306 ["It is elementary that an appellate court is confined in its review to the proceedings which took place in the trial court. [Citation.] Accordingly, when a matter was not tendered in the trial court, 'It is improper to set [it] forth in briefs or oral argument, and [it] is outside the scope of review.' "].) While the alleged criminal conduct is concerning, to say the least, it is not a proper basis for reversal by this court of the challenged receivership order.

---

[23] In his reply brief, Malan argues the timing of the conduct does not matter and quotes *Kendall-Jackson*, which states the general maxim that a plaintiff in equity "must come into court with clean hands, *and keep them clean*, or he will be denied relief, regardless of the merits of his claim." (*Kendall-Jackson*, *supra*, 76 Cal.App.4th at p. 978, italics added.) *Kendall-Jackson*, however, does not address the situation here, where conduct that was not before the trial court is used as the basis for a request that this court reverse the trial court's order.

DISPOSITION

The order is affirmed.  Appellants to bear respondent's costs on appeal.

HALLER, J.

WE CONCUR:


HUFFMAN, Acting P. J.


GUERRERO, J.